UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT:
WESTERN DISTRICT OF NEW YORK



CHRISTOPHER J KOCHAN

          Plaintiff

     -against-

OFFICER CORI KOWALSKI, COUNTY
OF CATTARAUGUS SHERIFF
DEPUTY WILLIAM J HUNT, COUNTY OF
CATTARAUGUS DISTRICT ATTORNEY
LORI PETTIT RIEMAN, COUNTY OF
CATTARAUGUS COURT CLERK
SECRETARY JILLIAN KOCH, COUNTY
OF CATTARAUGUS PERSONAL ASSISTANT
TO COUNTY JUDGE MARY REYNOLDS, and
UNKNOWN PERSONS

          Defendant

**MEMORANDUM IN
OPPOSITION TO
DEFENDANTS MOTION
TO DISMISS**
Civil Action Index No:
19-CV-251

## PRELIMINARY STATEMENT

Plaintiff submits this Memoranda of Law in Opposition to County of Cattaraugus Sheriff

Deputy William J. Hunt ("Defendant HUNT") and County of Cattaraugus District Attorney Lori Pettit

Rieman ("Defendant RIEMAN") Motion to Dismiss. Defendant HUNT should not be granted

qualified immunity, and did commit acts of excessive force and attempted to cover up his schocking

conduct, nor should Defendant RIEMAN be granted immunity after she conspired with other

defendants to shut down Plaintiff's website as an act of retaliation against Plaintiff for him having

published articles critical of her conduct as a public servant. Plaintiff's free speech was clearly that

was protected under the U.S. Const. amend. I, and N.Y. Const. Art. I § 8, and said defendants conduct

severely chilled Plaintiff's U.S. Const. amend. I right that was clearly shocking, retaliatory and conspiratorial in nature and appears to have set a precedent in the history of the United States. Further Plaintiff did not submit "scandalous material" as Defendant RIEMAN alleges in their motion to dismiss (Dkt. No. 20-1). Furthermore, Plaintiff had only received notice of the courts July 23, 2019 scheduling order entered on 7/29/2019, on August 12, 2019, after returning from a business trip, which Plaintiff left on August 1, 2019 and returned on August 11, 2019. Plaintiff thanks the court for extending his time to respond.

## LEGAL STANDARD OF REVIEW

In a motion for dismissal pursuant to Fed. Rule Civ. Proc.12(b)(6) of the complaint brought before the Court, the Court must accept all of the allegations contained in the complaint as true, in addition to drawing all reasonable inferences in favor of the non-moving party. Johnson v. University of Rochester Medical Center, 686 F. Supp. 2d 259, 263 (W.D.N.Y. 2010), see also Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163 (1993). To withstand a motion to dismiss under Fed. Rule Civ. Proc. 12(b)(6) a Plaintiff must plead enough facts to state a claim to relief which is plausible on its face. Bell Atlantic Corp. v. Twombly, 50 U.S. 544, 570 (2007). Further, legal conclusions are insufficient to state a plausible claim for relief. Graham v. Knebel, 2009 WL 4334382, at *2 (S.D.N.Y. 2009).

In Goodson v. Isch, Case # 16-CV-371-FPG, at *1 (W.D.N.Y. Jul. 22, 2019), this court found that in order to grant summary judgment;

> …the moving party demonstrates that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a)-(b); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Hicks v. Baines, 593 F.3d 159, 166(2d Cir. 2010). It is the movant's burden to establish the nonexistence of any genuine issue of material fact. If there is record evidence from which a reasonable inference in the non-moving party's favor may be drawn, a court will deny summary judgment. See Celotex, 477 U.S. at 322.

> Once the movant has adequately shown the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to present evidence sufficient to support a jury verdict in its favor, without simply relying on conclusory statements or contentions. Goenaga v. March of Dimes Birth

Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995) (citing Fed. R. Civ. P. 56(e)). "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not genuine issues for trial." Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996) (internal quotation marks omitted).

To state a valid § 1983 claim, "the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." Whalen v. Cnty. of Fulton, 126 F.3d 400, 405 (2d Cir. 1997) (citation omitted).

To survive a motion for summary judgment on § 1983 claims, the plaintiff must offer concrete evidence from which a reasonable juror could conclude that the defendants deprived him of the rights, privileges, or immunities guaranteed to him by law. See Johnson v. Davis, No. 12-CV-2449, 2015 WL 1286764, at *2 (E.D.N.Y. Mar. 20, 2015). Additionally, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010) (citation omitted).

Pro se pleadings should be "construed liberally," Phillips v. Girdich, 408 F.3d 124, 126-28 (2d Cir. 2005), citing Tapia-Ortiz v. Doe, 171 F.3d 150, 152 (2d Cir. 1999) (per curiam), and should not be dismissed unless "it is clear that the plaintiff would not be entitled to relief under any set of facts that could be proved consistent with the allegations," Phillips *supra*, at 126-28, citing Boddie v. Schnieder, 105 F.3d 857, 860 (2d Cir. 1997). Pro-se complaints must interpret them to raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).

Furthermore, concerning pro-se complaints;

Two working principles underlie Twombly. First, the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements. Id., at 555, 127 S.Ct. 1955. Second, determining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense. Id., at 556, 127 S.Ct. 1955. A court considering a motion to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Pp. 1948 – 1951. Ashcroft v. Iqbal, 556 U.S. 662, 663-64 (2009).

However; "Even after Twombly, though, we remain obligated to construe a pro se complaint liberally." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) citing Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (per curiam). Finally, the 2nd circuit has also held that when reviewing pro se submissions, a district court should look at them "with a lenient eye, allowing

borderline cases to proceed." Phillips *supra*, at 126-28, citing Fleming v. United States, 146 F.3d 88, 90 (2d Cir. 1998) (per curiam) (internal quotation marks omitted).

### 1. Defendant HUNT

Dkt. No. 20-1, pgs. 2-4, memorandum of law concerns Defendant HUNT paints a problematic narrative in an attempt to discount the facts that occurred. Defendants omit important facts that Plaintiff provided in his complaint which included, but not limited to *Id.* ¶ 44-46; (1) Defendant HUNT'S patrol car without its emergency lights on, in a reckless manner and showing no heed for the potential consequences of his actions started to execute a u-turn on Route 242 (Dkt. No.2 ¶ 44), and; (2) Defendant HUNT, as the driver of his patrol car failure and/or refusal to follow the proper rules of the road when he commenced a u-turn, from the side of the road, came to a rest perpendicular on Route 242, and blocked both lanes of travel (*Id.* ¶ 45), and; (3) in the process of the u-turn Defendant HUNT cut off Defendant OFFICER CORI KOWALSKI KOWALSKI's ("Defendant KOWALSKI") patrol car, driven by defendant KOWALSKI, and in doing so both patrol cars almost collided with each other (*Id.* ¶ 46; *Id.*, Ex. C file 27FEB19-BOTH-CAM and 27FEB19-REAR-CAM starting at 40 seconds), and; (4) defendant HUNT lied and perjured himself in an attempt to cover-up and/or justify his and defendant KOWALSKI's shocking and outrageous conduct *Id.* ¶ 68,69,77,88,89, and; (5) violation of departmental policy by defendant KOWALSKI *Id.* ¶ 56-58,60,62,87,90, and; (6) defendant KOWALSKI failed and/or refused to activate his turn signal and emergency lights when he violated NY VTL § 1161 upon his commencing his illegal u-turn. Dkt. No. 2 ¶ 40-47 see *Id.* Ex. C file 27FEB19-BOTH-CAM and 27FEB19-REAR-CAM starting at 37 secs. "The police must obey the law while enforcing the law." Spano v. New York, 360 U.S. 315, 320 (1959). All for a minor traffic violation.

Furthermore, Defendant KOWALSKI did admit that Plaintiff was obeying the law in his radio dispatch after Plaintiff's alleged probable cause traffic violation. Dkt. No.20-1 pg 3. Further, in New York, public servants are terminated for failure to follow police department procedures. Matter of

Murray v. Murphy, 24 N.Y.2d 150, 152 (N.Y. 1969).

While Plaintiff does not deny he wished to "'avoid any contact' with the police" and had "decided that it would be better to attempt to travel to a safe location . . .", Defendant Hunt omitted the rest of Plaintiff's claims, which Plaintiff wished to;

> "...stop at the County of Cattaraugus Sheriff's Department where he knew video monitors would capture the events, however Plaintiff changed his mind do to the prior events and decided to travel to what he believed was safe location, the center of Little Valley where there was a convenience store with outside video monitoring equipment that could record the stop from a 360 degree perspective" Dkt. No.2 ¶ 53.

Defendant HUNT further failed and/or refused to provide Plaintiff's state of mind claims that was due to Plaintiff's prior encounters with the 'legal system" *i.e. Ellicottville Police Department, Cattaraugus County Sheriffs Department, the District Attorney's Office and the Judicial Branches of county and local governments,* in which Plaintiff was forced to undergo numerous bogus evaluations that subjected him to severe mental anguish (Dkt. No.2 ¶ 24,144,145,180) in which the justice who forced Plaintiff to be evaluated admitted Plaintiff did not meet the requirements for evaluation, and in doing so the "justice" admitted he committed fraud upon the court *Id*. ¶ 24, Exhibit A, file: ex-17.pdf, and ex-18.pdf, which are parts of copies of the evaluations.

> A flagrant disregard of the facts, or assessing in opposition to the clear and undisputed facts, where the application of the statute could not by any means be doubtful, might, as in the case of Whitney v. Thomas 23 N.Y., 281, present a case where the officer would be without jurisdiction Buf. and State L.R.R. Co. v. Sup'rs Erie Co., 48 N.Y. 93, 99 (N.Y. 1871) citing Whitney, *supra*.

Further, Plaintiff had contacted numerous New York State agencies with oversight/supervisory powers concerning the matter which they failed and/or refused to address the unlawful and flagrant abuse of authority (Dkt. No.2 ¶ 24), which led to his fearful state of mind in which a real healthcare professional at ECMC admitted Plaintiff was justified in his fear of legal system. Exhibit A, file: ex-1.pdf, pg. 2, ("CPEP"). Plaintiff develop Anxiety as a result of the bogus evaluations

Defendant HUNT, in his problematic narrative, alleged he *"... was in the area at the time the pursuit was initiated, and his patrol car assisted Kowalski in terminating the pursuit; caught in*

*between the two patrol cars plaintiff"* (Dkt. No. 20-1, pg. 3). However, Defendant HUNT omits that

Plaintiff was traveling just below the speed limit, maintaining proper lane of travel after the alleged

minor probable cause violation. Defendant HUNT would further go on to imply in his motion to

dismiss that somehow Plaintiff was at fault for Plaintiff's window being shot-out or knocked out (Dkt.

No. 2 ¶ 72) in "approximately 26 seconds" by defendant KOWALSKI after being blocked in by

defendants. Dkt. No.20-1, pg 3. Plaintiff could not hear what defendants were yelling at him due to

fact that Plaintiff could not turn off his stereo (Dkt. No. 2 ¶ 66,70; Exhibit A, file: ex-16 at 0:03 secs.

("ST"), because he had guns pointed at him within two (2) seconds and placed his hands immediately

in the air and froze in fear. *Id.* ¶ 65,66,87. Plaintiff could not comprehend how to respond properly due

to the rapidly unfolding circumstances. *Id.* ¶ 74,87. Defendant HUNT in a contradiction in logic (Dkt.

No.20-1 pg. 3,4) would then imply it was Plaintiff's fault that his window was shot-out or knocked out

because Plaintiff attempted to turn off his stereo (ST) to hear what defendants were yelling. *Id.*¶ 77.

Plaintiff also did not have time to unbuckle his seatbelt, which caused defendant KOWALSKI to run

around to the passengers door, enter Plaintiff's car from the passengers door-side and unbuckle

Plaintiff's seatbelt. *Id.* ¶ 65. Defendant HUNT also omitted defendant KOWALSKI's bizarre tale of

how during their vicious assault, said defendants would casually stop the assault upon Plaintiff and

imply they would politely ask Plaintiff numerous times to exit his vehicle before continuing their

assault *Id.* ¶ 84. All of this occurring within sixty (60) seconds of Plaintiff being stopped for a minor

traffic infraction and in violation of police departmental policy *Id.* ¶ 56-58,60,62,87,90.

## <u>DEFENDANT'S HUNT (AND KOWALSKI) DID USE EXCESSIVE FORCE WHEN ASSISTING IN PLAINTIFF'S APPREHENSION.</u>

Defendant HUNT alleges that he could use "some degree of physical coercion or threat thereof

to effect it." <u>Graham v. Connor</u>, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871 (1989) on Plaintiff. The

evidence clearly showed that Defendants HUNT and KOWALSKI went well beyond "some degree".

Dkt. No. 2, Ex. C. file: 27FEB19-FWD-CAM.mp4, clearly showed the timeline from the stop to the

destruction of Plaintiff's drivers window and also evidences Plaintiff being removed from the vehicle. Exhibit A, file: ex-2.pdf, color photos of Plaintiff's injuries and also showed Plaintiff handcuffed to ambulance stretcher entering the hospital with a blood flow pattern emanating from his left ear and notifying hospital personal about his loss of consciousness. The photos and video also show Plaintiff leaving the hospital handcuffed with a blood flow pattern emanating from Plaintiff's left ear. Olean General Hospital personal did not address Plaintiff's head injuries in any manor whatsoever and in fact attempted to cover the injuries up by failing to document them in the medical records. The records even stated that Plaintiff was a "walk-in" and that Plaintiff had no head injuries and his auditory cannels were clear. *Id.* vehicle. Exhibit A, file: ex-3.pdf, pgs. 2-4,7-9, copy of Olean General Hospital Certified records. People v. Offen 96 Misc. 2d 147, provides similar circumstances, which is cited favorably by the Fourth Department in People v. Perez, 47 A.D.3d 1192 (N.Y. App. Div. 2008, and by the New York Court of Appeals in Matter of Davan L., 91 NY2d 88, 91 (1997). In Offen, *supra* at 150, a motion to dismiss the charge of obstructing governmental administration was granted (Penal Law, § 195.05), the same charge that mysteriously appeared in the indictment concerning Plaintiff's underlying matter. Dkt. No. 2 ¶ 32,34. Furthermore, "fleeing" from an officer prior to arrest is not a crime. In People v. Hawkins, 2014-28180, at *2 (N.Y. 2014) The court determined "as a matter of law that fleeing' from an officer prior to arrest is not [obstructing governmental administration]" (*Offen* at 150). And finally, in People v. Senkitael, 2011KN007585 (N.Y. Crim. Ct. Jul. 20, 2011), a case that most closely resembles the circumstances of Plaintiff's February 27, 2016 encounter with the "legal system", the Senkitael defendant was found not guilty of obstruction of government administration even after being stopped fleeing at over 25 miles over the speed limit and his failure and/or refusal to roll down his driver side window. In the underlying matter that gave rise to this action Plaintiff did not flee, nor did he go over the posted speed limit. Furthermore, Plaintiff was not charged with fleeing or speeding, Plaintiff simply wished to get to a safe location for all concerned. Dkt. No. 2 ¶ 53,85;

"Deponent further states Lt. Faizon a member of the New York City Police Department 88th Command arrived on scene instructing defendant to lower the window, defendant refused requiring Lt. Faizon to break defendant's window." Senkitael *supra*, at *2-3

As Senkitael *supra*, at *2-3 points out, a long period of time occurred between the stop and the breaking of the defendant's window, as well as the fact that defendant acknowledged his awareness of the command to roll down his window which he failed and/or refused to do so. In the underlying matter that gave rise to this action defendants HUNT and KOWALSKI did not provide Plaintiff the time, nor the circumstances to properly react to what was unfolding.

Plaintiff did not use the word "may" when describing him having been stomped upon. Plaintiff clearly stated that he awoke with pressure being applied to his upper right shoulder area by a dark figure. Dkt. No. 2 ¶ 81,88. Furthermore, plaintiff did make statements to the effect his head was being stomped upon while being transported in the ambulance when he was recited what had just occurred. Exhibit A, file: ex-4.mp4 at 6:55 min., and file: ex-5.mp4 at 2:52 min. While the audio is low and the statements can be heard, by simply amplifying the audio, utilizing one of any numerous audio software programs readily available to the general public, you can clearly hear Plaintiff stating "it was his feet, that's what it was.... pushed my head down into the ground [pavement]" *Id*. ex-5.mp4 at 2:52 min. Furthermore, the amended complaint does not plead any medical diagnosis because Plaintiff's head and shoulder injuries were in fact covered up by medical personal at Olean General Hospital which is presently the subject of a state legal action. Plaintiff described stroke, or stroke like symptoms Dkt. No. 2 ¶ 116,119 and the fact that Olean General Hospital cover it up *Id*. ¶ 157, Exhibit A, file: ex-3.pdf, pgs. 2-4,7-9.

The assertion that Plaintiff's "head injury did not require any medical care and was not substantive enough for his medical records to merit 'any mention of Plaintiff's head injuries.'" is preposterous. Defendant HUNT failed and/or refused to cite any case law in which injuries are not required to by documented by treating medical personal. Blood was clearly visible (*Id*. ¶ 95,105,158) and it was verbally admitted/acknowledged (*Id*. ¶ 98) by the on scene EMT. Exhibit A, file: ex-6.mp4

at 3:03 mins. Further Plaintiff reported his loss of consciousness at the entryway to the emergency

room to medical personal. *Id.* at 1:01 mins. New York Medical Malpractice lawsuits are rife with

failure to document and/or treat and/or misdiagnoses liability <u>Nelson v. State</u>, # 2015-051-503 (N.Y.

Ct. Cl. Oct. 30, 2015); <u>Causa v. Kenny</u>, 156 App. Div. 134 (N.Y. App. Div. 1913); <u>Estate of</u>

<u>Hammond v. Brunswick Hosp. Ctr., Inc.</u>, 38 Misc. 3d 1214 (N.Y. Sup. Ct. 2013); <u>Kagan v. State of</u>

<u>New York</u>, 221 A.D.2d 7 (N.Y. App. Div. 1996); <u>Gorham v. Markenson</u>, Index No. 800064/10 (N.Y.

Sup. Ct. 2013); *Torres v. City of N.Y.*, Index No. 162256/2014 (N.Y. Sup. Ct. 2018).

    Further, Defendant HUNT used the expression "De minimis" in an attempt to justify the failure

and/or refusal of hospital personal to document Plaintiff's head injuries, and yet again provided no

case law to substantiate his allegation. Furthermore, it appears that the expression "De minimis", as it

appears to be applied for legal purposes in medical malpractice actions, is for determining monetary

damages/awards as related to injuries, not for determining whether or not an injury should be

documented by medical professionals in their medical records, which Olean General Hospital personal

failed and/or refused to do so *Id*. ¶ 105,157. Finally, as previously stated defendants HUNT and

KOWALSKI attempted to coverup their outrageous and shocking conduct by omitting important facts

and by lying and perjuring themselves. In *Goodson v. Isch*, Case # 16-CV-371-FPG, at *5 (W.D.N.Y.

Jul. 22, 2019) the court found that;

> "De minimis injuries include, for example, "short-term pain, swelling, and bruising, brief
> numbness from tight handcuffing, claims of minor discomfort from tight handcuffing, . . .
> superficial scratches[, and] a cut inside the mouth." *Lemmo v. McKoy*, No. 08-CV-4264, <u>2011 WL</u>
> <u>843974, *5</u> (E.D.N.Y. Mar. 8, 2011) (citations omitted). Though the focus of inquiry in an
> excessive-force claim is on the force used rather than the injuries sustained, "[t]he extent of injury
> may also provide some indication of the amount of force applied." *Wilkins v. Gaddy*, <u>559 U.S. 34,</u>
> <u>37 (2010)</u> (per curiam). "Some degree of injury" is typically required to state an excessive force
> claim. *Taylor v. N.Y. Dep't of Corr.*, No. 10 Civ. 3819, <u>2012 WL 2469856, at *4</u> (S.D.N.Y. June
> 27, 2012) (brackets, quotation marks, and citation omitted).

    This was clearly not the case in this matter, even the on-scene personal, including Emergency

Medical Technician ("EMT") and others recognized the seriousness of Plaintiff's head injury. Exhibit

A, file: ex-7.mp4 at 6:51 min., video and audio on EMT asking Plaintiff about his head injury, and *Id*.

file: ex-8.mov at 35 seconds, shows defendant KOWALSKI inspecting Plaintiff's head injury, and *Id*.

file: ex-9.mp4 at 1:33 mins, shows another police officer asking to take pictures of Plaintiff's head

injury. However, due to the loss of memory Plaintiff had completely forgotten about his head injury

until rediscovering it later. Dkt. No.2 ¶ 110. Defendants HUNT and KOWALSKI's shocking and

brutal attack upon Plaintiff and the physical injuries that occurred included, but was not limited to his

shoulder and head injuries were not diagnosed until he was seen by competent medical professionals at

the Erie County Medical Center and elsewhere into 2018, well after the February 27, 2016 incent.

Exhibit A, file: ex-10.pdf, and Exhibit B.

Furthermore, defendant HUNT admits that jail personal failed and/or refused to provide

medical attention in violation of Plaintiff's due process rights (Dkt. No. 20-1 pg 4). Nelson v. State,

*supra*; Kagan v. State of New York, *supra*. In Schuster v. City of New York, 5 N.Y.2d 75, 81-82

(N.Y. 1958) the court cited numerous circumstances in which defendants who failed and/or refused to

render aid can be held liable; to a taxicab driver shot by a passenger negligently placed in his cab by

policemen (Lubelfeld v. City of New York, 4 N.Y.2d 455); to the estate of an arrested man who died

from pneumonia caused by exposure in the jail and failure to treat a fractured hip and elbow

(Dunham v. Village of Canisteo, 303 N.Y. 498); to the estate of a man negligently shot by a policeman

for making a disturbance while intoxicated (Flamer v. City of Yonkers, 309 N.Y. 114); to the estate of

a man arrested for public intoxication who died from cerebral hemorrhage in consequence of failure of

the police to procure medical aid (O'Grady v. City of Fulton, 4 N.Y.2d 717); to a wife shot by her

husband to whom the police had negligently returned a pistol (Benway v. City of Watertown, 1

A.D.2d 465); and to a bystander injured while directing traffic at the instance of a police officer

(Adamo v. P.G. Motor Freight, 4 A.D.2d 758). In McCrink v. City of New York 296 N.Y. 99, a city

was held liable for negligently having omitted to discharge a police officer by whom plaintiff's

intestate was shot.

Furthermore, Plaintiff was questioned at the 50-H hearing on issues relating to this 2016 matter. Therefore, defendants admitted and provided evidence they were on notice/aware and concerned that a suit for their 2016 conduct was possible concerning Plaintiff's website. Exhibit A, file: ex-11.pdf, pg. 95 being question concerning website shutdown by said defendants, and defendants HUNT and KOWALSKI *Id*. pgs. 121-138, for state claims, which is an excerpt of the 50H hearing specifically discussing the 2016 incident which this action arose from. Finally, Plaintiff was clearly under arrest before his driver's side window was either shot-out or knocked out. Dkt. No. 2 ¶ 87. Plaintiff was boxed in and unwilfully stopped of his liberty and had guns drawn on him it two seconds. In *United States v. Ceballos*, 654 F.2d 177 (2d Cir. 1981) the court found that;

> "Rather, we conclude that Ceballos was arrested at the moment the progress of his car was blocked; (Dkt. No.2 ¶ 60,87,135) and he was faced by the officers with their guns drawn (*Id*. ¶ 65,66,68,87) and ordered out of his car." (*Id*. file: 6-7-17-transcript, transcript of underlying trial), see also Dkt. No. 2, Ex C: 27FEB19-FWD-CAM at 3.17 min; *Id*. Ex. E. para. 4; Ceballos, *supra* at 180

Defendant HUNT and KOWALSKI's conduct was shocking, outrageous beyond and was clearly excessive force. When a 'request' comes from the barrel of a loaded gun pointed at you, it is not a request, it is a threat.

## DEFENDANT HUNT (AND KOWALSKI) IS/ARE NOT SHIELDED BY QUALIFIED IMMUNITY

The qualified immunity doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009). A plaintiff can only overcome an officer's qualified immunity defense if he or she can show: (1) a significant injury; (2) that resulted from the use of clearly excessive force that violated the individual's Fourth Amendment rights; and (3) that the force used was objectively unreasonable, taking into account what a reasonable officer would do in the specific circumstances confronting the officer at the scene. In

Horace v. Gibbs, 14-CV-655S (W.D.N.Y. Oct. 9, 2018), the court found; (1) ("[W]hile a sustained injury that requires doctors' visits is not a necessary element of a successful excessive force claim, where a plaintiff suffers from de minimis injury, it is more difficult to establish that the force used was excessive in nature." Id. at *10-11; see also Goodson v. Isch, supra. Furthermore. Defendant HUNT admitted it was a "Terry Stop". Dkt. No. 20-1 pg. 5. A Terry stop does not allow for the use of excessive force. Ikezi v. City of New York, 14-CV-5905 (E.D.N.Y. Mar. 31, 2017). As already stated, Plaintiff was clearly under arrest, at a minimum, at the point of being blocked in, however according to Defendants, Plaintiff was not arrested until 4:25 AM, when he was in the hospital, which is preposterous. Exhibit C.

        In this matter Plaintiff was taken to the hospital, the hospital employees attempted to cover-up Plaintiff head and shoulder injury by failing and/or refusing to document and treat the injuries Dkt. No.2 ¶ 105,157. Plaintiff soon suffered a stroke or stroke like conditions soon after. Id. ¶ 166,118. Further, Plaintiff was not properly diagnosed or treated until about one year after the 2016 attack and into 2018. Exhibit A, file: ex-10, and Exhibit B. Plaintiff's injuries were clearly not "de minimis" injuries, and; (2) and (3) the injuries were clearly brought about by defendants HUNT and KOWALSKI's shocking and outrageous conduct when defendant KOWALSKI failed or refused to abide by departmental procedures (Dkt. No.2 ¶ 56-58,60,62,87,90) in stopping Plaintiff, who, at the time was attempting to get to a safe location (Id. ¶ 53) and did not attempt to speed away or evade (Exhibit A, file: ex-12, pg. 80, L 17-23, transcript of defendant KOWALSKI testimony) defendants KOWALSKI and HUNT road until defendants KOWALSKI violated departmental procedures after the alleged probable cause incident, and further did not provide Plaintiff the proper time to respond to the circumstances as they were rapidly unfolding (Id. ¶ 74,87), that had been clearly established in prior case law (Offen, Perez, Matter of Davan L, Senkitael, supra ; sea also Vincent v. Yelich, 718 F.3d 157 (2d Cir. 2013)), within 24 second of having been blocked in (Dkt. No. 2 ¶ 60,87,135), and

shot-out or knock out Plaintiff's drivers side window (*Id*. ¶ 87), because he could not hear do to not

being able to turn off his stereo (*Id*. ¶ 66,70,71; ST), sending sharp dangerous glass projectiles (*Id*. ¶

73) into Plaintiff's face with no warning (*Id*. ¶ 23). Plaintiff would then be violently removed from the

driver's seat and then violently thrown to the ground head first and rendered unconscious (*Id*. ¶ 75),

stomped upon and handcuffed (*Id*. ¶ 87), then upon regaining consciousness would be yanked to his

feet causing more pain and suffering (*Id*. ¶ 82). Said Defendants would cast aside their oath, care and

concern for the U.S. Const. amend. IV and XIV protected Rights, safety or concern of Plaintiff that

any reasonable and honorable officer would abide by. Said Defendants would further lie and perjure

themselves (Dkt. No.2 ¶ 68,69,77,88,89) in order to justify and/or cover up <u>United States v. Kubrick,</u>

444 U.S. 111 (1979), there shocking and outrageous conduct. Furthermore, defendant KOWALSKI

alleged that Plaintiff did not stop"...the [his] vehicle completely" as he exited his patrol car (Exhibit

A, file: ex-15.mp4 at 1:17 min) as the reason he took the actions he did. However, the video evidence

clearly showed that Plaintiff did stop his vehicle completely before defendant KOWALSKI exited his

patrol car, Plaintiff just did not have the time to turn it off due to the circumstances as so described

herein. <u>Dkt.No. 2</u> Ex. C, file: 27FEB19-FWD-CAM at 3:24 min. Defendant HUNT, nor Defendant

KOWALSKI qualify for immunity. <u>Bivens v. Six Unknown Fed. Narcotics Agents,</u> 403 U.S. 388

(1971)

### 2.  **Defendant RIEMAN**

<u>**PLAINTIFF DID STATE AND PROVE A CLAIM OF CONSPIRACY AND PROXIMATE**</u>
<u>**CAUSE BETWEEN DEFENDANTS RIEMAN (AND KOCH AND REYNOLDS)**</u>

Plaintiff's website went offline on, or about June 8, 2016, two days after the first fraudulent

complaint submitted by Defendant REYNOLDS occurred. Dkt. No. 2, Ex. S. Plaintiff's attempt to

remove any reference to Defendants REIMAN, KOCH and REYNOLDS (*Id*. Ex. Q,R,S) as demanded

by Plaintiff's hosting service turned into a futile effort. It remained offline until June 14, 2016. Dkt. No. 2 at ¶140-145.

The temporal proximity from the first fraudulent complaint (Defendant REYNOLDS) to the last (Defendant RIEMAN) was approximately one week. In cases that accept mere temporal proximity between an adversaries knowledge of protected activity, in this case Plaintiff's U.S. Const. amend. I substantive and protected Right, and an adversary's action to violate the protected activity, to establish a prima facie case, the temporal proximity must be "very close". In <u>Crawford v. Metro. Gov't of Nashville & Davidson Cnty.,</u> 555 U.S. 271 (2009), the United States Supreme Court cited <u>O'Neal v. Ferguson Constr. Co.</u>, 237 F.3d 1248, 1253 (CA10 2001) where the temporal proximity was determined to be within a two-week time frame;

> "…to establish a prima facie case uniformly hold that the temporal proximity must be "very close," <u>Id.</u> at 1253 (CA10 2001)."

A time line of the actions taken by defendants in this matter clearly show from the time of the first fraudulent complaint by defendant RIEMAN in the shutting down of Plaintiff's website was approximately one week after Defendants KOCH and REYNOLDS;

1. Defendant REYNOLDS: June 6, 2016, Dkt. No. 2 at ¶140 and Ex. S
2. Defendant KOCH: June 7, 2016, June 6, 2016, Dkt. No. 2 at ¶140 and Ex. Q
3. Notification of shutdown: June 9, 2016
4. Plaintiff's response: June 10, 2016, (Exhibit A file: ex-13.pdf.)
5. Defendant RIEMAN: June 13, 2016, June 6, 2016, Dkt. No. 2 at ¶140 and Ex. R

Clearly Plaintiff stated and proved that defendants actions was a proximate cause of Plaintiffs injury.

<u>Gierlinger v. Gleason</u> 160 F.3d 858, 872.

Plaintiff also clearly stated and proved the conspiracy of defendants RIEMAN, KOCH and REYNOLDS. In People v. Connolly, 253 N.Y. 330, 342 (N.Y. 1930) the New York State Court of Appeals found that;

It was not necessary to prove a conspiracy before evidence of specific acts of the alleged conspirators could be received. The conspiracy itself could be established by evidence of particular acts, which, taken together, furnished a basis for a finding that a conspiracy existed. (People v. Miles, 123 App. Div. 862, 875; affd., 192 N.Y. 541.)

At the federal level four elements required to be proven beyond a reasonable doubt: (1) that the conspiracy was willfully formed and existed. Further, the agreement need not be shown to have been explicit. It can instead be inferred from the facts and circumstances of the case. Direct Sales Co. v. United States, 319 U.S. 703, 711-713 (1943); (2) that the accused knowingly and willfully joined the conspiracy; (3) that at least one co-conspirator thereafter knowingly committed one of the overt acts (in this case three did), as set forth in the indictment; and, (4) that such overt act was committed to further an object or purpose of the conspiracy, as charged. In this case the shutdown of the website. In this matter defendant RIEMAN clearly participated (Dkt. No. 2 ¶ 139-145) when she submitted a fraudulent complaint (Id. ¶ 140; Ex. R) while at work (Id. ¶ 141) in close proximity (Crawford citing O'Neal v. Ferguson Constr. Co, *supra*) to defendants KOCH and REYNOLDS fraudulent complaints (Id. ¶ 140; Ex. Q,R) that alleged Plaintiff had published private and personal information which all said defendants have failed and/or refused to provide any evidence whatsoever that their private and personal information was published on Plaintiff's website.

Further, defendant RIEMAN'S citation to Warner v. Orange County Dep't of Probation, 115 F.3d 1068 (2d Cir. 1996) is misplaced. In the Warner matter the issue was Orange County Dep't of Probation recommending to the sentencing court that the defendant attend Alcoholics Anonymous ("AA") meetings and when the probation officer felt that probationer was not meeting the requirements, he coerced the probationer into another program with heavy religious undertones which petitioner objected to. Plaintiff's hosting service that cancelled his website is, and was not a

government entity and defendant RIEMAN[1,2,3] clearly conspired and retaliated against Plaintiff with defendants KOCH and REYNOLDS for exercising his U.S. Const. amend I Rights that public servants are clearly prohibited from denying. Defendant's citation simply does not apply. Furthermore, Plaintiff has never published anything on the website even hinting of violence against any person.

## PLAINTIFF DID STATE AND PROVE A CLAIM OF RETALIATION, AND INJURY BY DEFENDANT RIEMAN (AND KOCH AND REYNOLDS)

Discrimination by the government officials of private speech is flatly prohibited—beyond the reach of government. Police Dep't v. Mosley, 408 U.S. 92, 95 (1972); see also U.S. Const. amend. I; Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 641 (1994). "[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions (Dkt. No. 2 ¶ 106, 107,108,113,134,135), for speaking out." Hartman v. Moore, 547 U.S. 250, 256, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006)(citing Crawford-El v. Britton, 523 U.S. 574, 592, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998)). Preventing the government from engaging in viewpoint discrimination has long been the central tenant of the First Amendment. See, e.g., Joseph Blocher, Viewpoint Neutrality and Government Speech, 52 B.C.. L. Rev. 695, 703-05 (2011). First Amendment protections extend to "'every sort of publication which affords a vehicle of information and opinion.'" von Bulow v. von Bulow, 811 F.2d 136, 144 (2d Cir.) (quoting Lovell v. Griffin, 303 U.S. 444, 452 (1938)), cert. denied, 481 U.S. 1015 (1987). See also New York Times Co. v. Sullivan, 376 U.S. 254 (1964), The First Amendment confers individuals the "freedom to express disagreement with state action, without fear of reprisal based on the expression." Barnes v. Wright, 449 F.3d 709, 717 (6th Cir. 2006)(internal quotation omitted)(citing McCurdy v. Montgomery Cnty.,

---

[1] http://catcountycorruption.com/cattaraugus-county-new-york-district-attorney-lori-rieman-commits-fraud-upon-the-supreme-court-4th-appellant-division-rochester-new-york/

[2] http://catcountycorruption.com/local-rights-activist-targeted-for-assassination-by-lori-rieman-cronies-ellicottville-pd-fails/

[3] http://catcountycorruption.com/lori-rieman-sued-for-3-million-cat-county-for-1-million-taxpayers-on-the-hook/

240 F.3d 512, 520 (6th Cir. 2001)); Yohe v. Nugent, 321 F.3d 35, 44 (1st Cir. 2003);   Tierney v.

Vahle, 304 F.3d 734, 743 (7th Cir. 2002); Chaiken v. VV Pub. Corp., 119 F.3d 1018, 1034 (2nd Cir.

1997); Brown v. Hearst Corp., 54 F.3d 21, 27 (1st Cir. 1995); Beverly Hills Foodland, Inc. v. United

Food and Commercial Workers Union, Local 655, 39 F.3d 191, 196 (8th Cir. 1994); see also Correllas

v. Viveiros, 410 Mass. 314, 324 (1991).

It is very apparent that Defendant RIEMAN took further retaliatory actions only after

Plaintiff's website was shutdown and he had desperately attempted to restore it with the in-country

out-of-state hosting service. Exhibit A file: ex-13.pdf. This evidenced the clear retaliatory nature of

said defendants, and specifically the malice and recklessness of Defendant RIEMAN. Kolstad v.

American Dental Assn, 527 U.S. 526, 537 (1999) citing 1 D. Dobbs, Law of Remedies 468 (2d ed.

1993) ("Punitive damages are awarded when the defendant is guilty of both a bad state of mind and

highly serious misconduct")." Defendant RIEMAN's reckless and intentional nature is further

supported by the conclusions/allegations of an officer of the court and former Assistant District

Attorney in Dettelis v County of Cattaraugus 14-cv-01096 Dkt. No. 1 at ¶ 96,97,98;

> 96. Defendants were negligent in the hiring of the aforesaid agents, servants and/or
> employees in that they knew, or in the exercise of reasonable care should have known, that said
> agents, servants and/or employees of Defendant COUNTY OF CATTARAUGUS did not
> possess the temperament and psychological makeup to properly carry out their duties as
> responsible government officials.
>
> 97. Defendants were negligent in the training of the aforesaid agents, servants and/or employees
> in that they failed to train Defendants in proper and ethical prosecutorial procedures and/or in the
> rights of suspects under the United States Constitution in general.
>
> 98. Defendants were negligent in their supervision of the aforesaid agents, servants and/or
> employees in that they permitted said agents, servants and/or employees to violate proper and
> ethical prosecutorial procedures and/or the rights of citizens under the United States Constitution
> in general; failed to discipline personnel who violated proper and ethical prosecutorial procedures
> and/or the rights of suspects under the United States Constitution in general; tolerated the
> behavior of personnel who violated proper and ethical prosecutorial procedures and/or the rights
> of suspects under the United States Constitution; and failed to enforce proper prosecutorial
> criteria or guidelines Defendants were negligent in the training of the aforesaid agents, servants
> and/or employees in that they failed to train Defendants in proper and ethical prosecutorial

procedures and/or in the rights of suspects under the United States Constitution in general.

It must also be noted that we are dealing with public servants who operated in two separate branches of government, the judicial and executive, who conspired together to deprive a private citizen of his protected, substantial U.S. Const. First Amendment Right to free speech, which, due to the circumstances, appears to have set a precedent in the history of this Nation.

Furthermore, in the underlying matter that led to this action there were numerous outbursts by defendant RIEMAN, that clearly showed her biased, hostile intent and obsession in destroying Plaintiff. One specifically comes to mind that occurred during one of Plaintiff's hearing to settle the record. Defendant RIEMAN was represented by one of her employees, one "ADA" Elizabeth Ensell ("Ensell"). Exhibit A, file: ex-14, pg. 19. Plaintiff had simply glanced back at the prosecution table to his right after he noticed Ensell looking back at her table. Defendant RIEMAN, unbeknownst to the Plaintiff, had entered the courtroom and had taken a seat at the prosecutors table. She was sitting with her arms crossed and appeared to be shaking. Plaintiff looked forward then glanced back again at the table in which defendant RIEMAN was sitting to confirm what he just saw when defendant RIEMAN yelled out towards defendant "DON'T YOU STARE AT ME", at which point defendant requested her outrageous and shocking outburst appear on the record. Her actual outburst did not appear on the record, however her response afterwards did appear which supports Plaintiff's claim's that the outburst did occur (*Id.* at pg. 19). The transcriber had omitted her "DON'T YOU STARE AT ME" outburst, but Plaintiff was not surprised by the omittance due to the fact the stenographer/transcriber had provided evidence of her biased nature against Plaintiff in the past. Exhibit D. Further, it does appear the transcriber has 'retired' from public service soon after the conclusion of the underlying matter that gave rise to this action. Furthermore, "ADA" Elizabeth Ensell herself, and her family members[4] had

---

[4] http://catcountycorruption.com/john-catherine-elizabeth-ensell/

been subject to numerous articles on Plaintiff's website CatCountyCorruption.com, including an article which described an incident in which "ADA" Ensell ran into a pedestrian in a clearly marked crosswalk in the city of Olean, New York, hospitalizing the pedestrian, who also appeared to be a suffer of cerebral palsy, and the Olean Police Department covered it up[5]. A witness at the scene even executed a sworn statement that Ensell was looking down and not paying attention when she hit the pedestrian. Further, the "panic and severe mental anguish" injury, according to and admitted by Defendant RIEMAN was when she forced Plaintiff to undergo numerous examinations (*Id.* ¶ 24) by and through her employees and/or agents and/or servants, which included, but not limited to "ADA" Ensell.

Plaintiff had an U.S. Const. amend. I interest in his website CatCountyCorruption.com that published articles concerning public officials acting in their public capacity (Dkt. No. 2 ¶ 26,27,140,195), and it was clear by the submission of the fraudulent complaints of defendants RIEMAN, KOCH and REYNOLDS. Defendant REYNOLDS[6] and KOCH[7],[8] were also subjects of articles on Plaintiff's website. It is preposterous to think that said defendants actions were not motivated and/or substantially caused by Plaintiff's exercise of his U.S. Const. amend. I substantive and protected right. Dkt. No. 2 ¶ 140-143. It appears that Defendants conduct in this matter is unprecedented as clearly stated in plaintiffs amended complaint and herein and said defendants shocking and outrageous conduct clearly chilled the exercise of Plaintiff's First Amendment Right by taking Plaintiff's website offline. Dkt. No. 2 ¶ 144-145. Curley v. Vill of Suffern, 268 F.3d 65,73 (2d Cir 2001).

---

[5] http://catcountycorruption.com/olean-police-department-covers-up-criminal-conduct-of-assistant-district-attorney-elizabeth-noelle-ensell/
[6] http://catcountycorruption.com/97-rock-reynolds-denies-access-to-pro-se-court-file/
[7] http://catcountycorruption.com/jillian-koch-and-the-catt-county-criminal-rico-octopus/
[8] http://catcountycorruption.com/koch-state-attorney-general-pro-se-file-complaint-pib-public-integrity/

## PLAINTIFF DID PROVE DEFENDANT RIEMAN WAS ACTING UNDER THE COLOR OF LAW

Plaintiff clearly alleged in his complaint that said defendants, employed in separate branches of government, while on taxpayer time, did conspire to submit, did submit individual fraudulent complaints in close proximity to each other, as so previously stated herein, that caused Plaintiff website to be shut down. Dkt. No. 2 ¶ 6,7,181. In Gleason v. Scoppetta, 13-2770-cv (2d Cir. 2014) citing Monsky v Moraghan 127 F.3d 243 the court concluded that an official can act under color of state law even when the actions at issue are not typical of that official's duties, as has occurred in this matter. The judge in the Gleason matter who was responsible for a dog, in court, stood by as the dog attacked/harassed a person. Defendants RIEMAN, KOCH and REYNOLDS did the exact same thing found in Gleason, *supra*. In this matter while at work, at the County of Cattaraugus Building, a building funded by taxpayers, their wages being paid for by tax paying citizens, the fraudulent complaints, which required an official government identification to verify, transmitted across state lines on tax payer funded equipment, such equipment and office spaces can only be used by those privileged to do so, and used such to attacked and shutdown Plaintiff's website, while acting in their official capacities (Dkt No. 2 Id. at ¶ 6,7,181), Ashcroft v. Iqbal, 556 U.S. 662, 663-64 (2009); Phillips v. Girdich, 408 F.3d 124, 126-28 (2d Cir. 2005), all within approximately a one-week timeframe. Finally, if questions still persist concerning the color of law issue, it should be left for the jury to decide, in Chapman v. Higbee Co., 319 F.3d 825, 834 (6th Cir. 2003), leave granted, certiorari denied. 542 U.S. 945 (2004), the court found;

> The inquiry is fact-specific, and the presence of state action is determined on a case-by-case basis. See Burton v. Wilmington Parking Auth.,365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Although "it is possible to determine . . . whether a person acted under color of state law as a matter of law, there may remain in some instances unanswered questions of fact regarding the proper characterization of the actions for the jury to decide."Layne,627 F.2d at 13 (internal citations and quotations omitted).

Based on defendant RIEMAN's other conduct as so stated herein and in Plaintiff's complaint, defendant's allegation that she "merely requested removal of references to her" is pure speculation on defendant's part. Furthermore, Defendant RIEMAN had previously been sued for defamation and release of confidential information in state court while acting in her official capacity in the recent past. See Exhibit E, which is a copy of said lawsuit in state court. Again, the terms that Plaintiff's in county hosting service cited did not match what they demanded be removed in any manner whatsoever. Further, further discovery will also support the claims of Plaintiff defendants acted under the color of law is true. Zieper v. Metzinger, 474 F.3d 60, 65 (2d Cir. 2007) citing Zieper v. Reno, 00 Civ. 5594(RMB), 2002 WL 1380003, 2002 U.S. Dist. LEXIS 11421 (S.D.N.Y. June 26, 2002).

Plaintiff did allege defendant RIEMAN acted in her "official position" to shut down Plaintiff's website Dkt. No. 2 ¶ 6,7,181. Further evidence of defendant RIEMAN's temperamental and psychological nature clearly call into question her ability to properly carry out her duties of office, and again, it must be noted for the record that the hosting services reason for shutting down Plaintiff website was not for publishing private and/or personal as it alleged in its notices (Id. ¶ 26). It explicitly demanded Plaintiff remove all references to said defendants (Dkt. No. 2. Ex. Q,R,S), and the hosting service even went so far as to demand Plaintiff remove defendant KOCH's name from the database that was not publicly viewable, inferring severe official pressure was applied to shut it down. Exhibit F. Further, defendant cite Combier v. Portelos, 17-CV-2239, at *11 (E.D.N.Y. Jul. 5, 2018), however, in that matter the defendants did not shut down Plaintiff's website. In Hammerhead Enterprises, Inc. v. Brezenoff, 707 F.2d 33 (2d Cir. 1983), the matter concerned negative publicity concerning a game. It was newspapers that brought to national attention the game, and the negative publicity that ensued by public servants causing the action. The newspapers themselves were not shut down. A far cry of what occurred in this matter. Further in Zieper v. Metzinger, 474 F.3d 60, 65-66 (2d Cir. 2007), the court found;

It is well-established that "First Amendment rights may be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech." Aebisher v. Ryan, 622 F.2d 651, 655 (2d Cir.1980). Accordingly, the First Amendment prohibits government officials from encouraging the suppression of speech in a manner which "can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." Hammerhead Enters., Inc. v. Brezenoff, 707 F.2d 33, 39 (2d Cir.1983), and "In June 2002, the district court denied this motion on the ground that discovery was necessary, see Zieper v. Reno, 00 Civ. 5594(RMB), 2002 WL 1380003, 2002 U.S. Dist. LEXIS 11421 (S.D.N.Y. June 26, 2002)" Zieper v. Metzinger, 474 F.3d 60, 65 (2d Cir. 2007).

## PLAINTIFF DID NOT SUBMIT SCANDALOUS MATERIAL AS EVIDENCE

The temperamental and psychological make-up of defendant RIEMAN has been called into question not only an officer of the court, local media has also presented evidence of her state of mind as it relates to her treatment of defendants/suspects contemporaneous to Plaintiff's underlying matter which gave rise to this action. In Dkt. No.2 at Ex. A., at the bottom of the article is an e-mail sent by defendant RIEMAN to the New York State Police, acquired by the Buffalo News, that clearly denotes her state of mind concerning a case transferred to her office, which she oversaw, concerning a defendant/suspect which the State of New York found the person was a victim of a homicide at the hands of public servants. Defendant RIEMAN would also threaten a family member of the victim when Defendant RIEMAN failed and/or refused to respond to the many requests of the family members on updates. Exhibit G. This is clearly not "scandalous material" and goes directly to the state of mind of Defendant RIEMAN. Federal Rules of Evidence 803(3) clearly allows "state of mind" evidence to be submitted/presented and Rule 902(6) allows newspaper published articles to be self-authenticating. Dkt. No. 2 Exhibit A should not be stricken from this matter, nor any other state of mind evidence against Defendant RIEMAN. It is shocking that such a request even be made given the position defendant RIEMAN now holds over citizens/individuals. The Buffalo News article clearly evidenced defendant RIEMAN'S state of mind/nature concerning suspects/defendants. Finally, defendant RIEMAN cites Precimed Inc. v. ECA Med. Instruments, 13-CV-761 (W.D.N.Y. May. 12, 2014), however, it concerns private parties, which is not the case in this matter. Defendant RIEMAN is a public servant and was at the time of the conduct that gave rise to this action, and held herself out to

be. Dkt. No. 2 ¶ 6,7,181. <u>People ex rel. Arcara v. Cloud Books</u>, 68 N.Y.2d 553; *see also* <u>Clear Channel</u>

<u>v. City of New York</u>, 594 F.3d 94 (2d Cir. 2010); New York Times Co. v. Sullivan, *supra*. There are at

least three examples of this type of conduct from three completely separate cases that clearly establish

the temperamental and psychological pattern of Defendant RIEMAN as so described in Dettelis, *supra*

¶ 96,97,98; *see also* <u>Monell v. New York City Dept. of Social Services</u>, 436 U.S. 658 (1978).

## DEFENDANT RIEMAN IS NOT ENTITLED TO IMMUNITY

While "Prosecutorial immunity from § 1983 liability is broadly defined, covering 'virtually all

acts, regardless of motivation, associated with [the prosecutor's] function as an advocate.'" Hill v. City

of New York, 45 F.3d 653, 661 (2d Cir. 1995), citing Dory v. Ryan, 25 F.3d 81, 83 (2d Cir. 1994), it is

not absolute. In Bouchard v. Olmsted, 18-1658, at *3 (2d Cir. May. 30, 2019) the court found that;

> "the Supreme Court has found prosecutors absolutely immune from suit for alleged misconduct
> during a probable cause hearing, in initiating a prosecution, and in presenting the State's case," but
> has "withheld absolute immunity for conduct unrelated to advocacy, such as giving legal advice,
> holding a press conference, or acting as a complaining witness." Flagler, 663 F.3d at 547
> (footnotes omitted).

There are numerous other examples where immunity is not entitled. District Attorneys can be

held accountable when acting outside of their duties under the color of law U.S.C. Title 18 § 242,

which occurred in this matter. Dkt. No. 2 ¶ 140-145. Furthermore, defendant RIEMAN cite of Hill,

*supra*, is misplaced. The Hill matter dealt with the fabrication of video evidence by an assistant district

attorney and others in the performance of their official functions concerning a criminal matter which

was brought before a court. In this matter that did not occur. Prosecutorial misconduct is so severe in

New York the Governor recently signed into law a bill that creates special commission, the first in the

nation, to investigate local prosecutors for misconduct[9]. The pattern and practice as so stated in

Dettelis, *supra*, is so clear and present, that any reasonable person could understand what had occurred

---

[9] https://www.nytimes.com/2019/04/05/nyregion/ny-prosecutors-cuomo.html

when properly presented with the facts. Hope v. Pelzer, 536 U.S. 730 (2002). As an elected official

defendant RIEMAN was mandated to take an oath of office to the U.S. Const. (5 U.S.C. § 3331) and

the N.Y. Const. (N.Y.Const. Art. XIII ¶ I) to protect and defend the very documents that she alleged,

and alleges, gives her the authority to act as a public servant. She was also a policy maker Escalera v.

Lunn, 361 F.3d 737 (2d Cir. 2004), and supervisor. Ying Jing Gan v. City of New York, 996 F.2d 522

(2d Cir. 1993). She cannot claim she was acting within her duties as an advocate and/or prosecutorial

functions when she submitted the fraudulent complaint which violated Plaintiff's U.S. Const. amend I,

protected Right, and in doing so perjured her oath of office. Defendant RIEMAN is not entitled to any

type of immunity. Nor are the other defendants. Finally, facts in dispute are for a jury to decide. U.S.

Const. Amend. VII.

### CONCLUSION

For all the reasons set forth herein, the Plaintiff respectfully requests that the Court DENY

relief to Defendants RIEMAN, KOWALSKI, HUNT, KOCH AND REYNOLDS motion to dismiss,

or other relief in favor of Plaintiff the court deems just and proper, including, but not limited to

Fed.R.Civ.P. 15(a) and/or Local Rule 7 (a) (6) if need be.

DATED: Little Valley, New York
August 19, 2019

All Rights Reserved

Christopher J Kochan
PO Box 21
Little Valley New York 14755
chris12108@gmail.com
716-938-9658

MARY J. WOODAREK
#01WO6018192
NOTARY PUBLIC, State of New York
Qualified in Cattaraugus County
My Commission expires January 4, 2023

Exhibit A

Manually Filed CD



# ECMCC
**462 Grider Street**
**Buffalo NY, 14215**
*P (716) 898-3000 F*

**CHRISTOPHER KOCHAN**
**PO BOX 21**
**LITTLE VALLEY, NY 14755**

DOB - 07/02/1964
Encounter Date 01/10/2017

## Health History
**Health History:** Assessment was done on 1/10/2017.
Patient has not recently lost weight without trying.
Malnutrition Screening Tool Total score is. 0. Past Medical History was reviewed and data updated. Past Surgical History was reviewed and data updated. Family History was reviewed and data updated. Social History was reviewed and data updated. Allergies were reviewed and data updated. Medication History was reviewed and data updated. Immunization History was reviewed with no changes.

Preferred language is English. Does not speak a language other than English at home. No interpreter is required. Patient has hearing loss in right ear.
Patient has eyeglasses that are currently worn.
Patient has learning barriers such as visual , cognitive/verbal  and cognitive/written . Patient has no preferences to learning styles.

## Chief Complaint
PAtient is alert and ambulatory here today for IV assaulted 2/27/16. Patient was taken to Olean General. This appt has been rescheduled a couple of times per patient. Patient has several c/o's since assault: buzzing in head, vision changes double and difficulty focusing. Patient also c/o's neuropathy type pain right side of body. Difficulty with short term memory. DG.

## History of Present Illness
52yo Caucasian male with no PMHx who presents with memory difficulty following head trauma. He states that in February of 2016 he was pulled over by police and dragged out of his car. He states that he was push out of his car and slammed his left body and head on the ground. He states that he then was struck in his right shoulder. She did have 3 minutes of LOC. He was taken to Olean General Hospital where he was seen by the ED then discharged. He states that since that time he has had memory difficulties as well as chronic pain pain in his right shoulder, occasional tingling/numbness in his right arm, and a "buzzing" in his head. He states that his memory issues are described as minor short term memory loss. He states that he has difficulty remember multiple numbers. He is able to perform all of his ADLs. He is not on any medications. In regards to the pain in his right shoulder and tingling, he states that the pain is chronic and the tingling occasionally occurs in his entire hand and forearm. He also admits to weakness in his RUE. He was initially seen by orthopedics told the patient that he likely had an injury to his rotator cuff however no surgery was recommend and he could not afford an MRI at the time as he does not have insurance. The patient continues to not have insurance however is actively working toward applying for insurance. He admits to difficulty focusing when reading. He denies double vision or eye pain. He denies any symptoms of depression, however admits that he is very stressed about his current legal situation regarding this injury.

## Review of Systems

**Constitutional:** negative.

**EXHIBIT B**

*Patient:* **CHRISTOPHER KOCHAN**
*Encounter:* **01/10/2017 12:45PM**     *MRN:*   **M001187123**

**Head and Face:** Head "buzzing".
**Eyes:** trouble focusing on words after reading for long period of time.
**ENT:** negative.
**Cardiovascular:** negative.
**Respiratory:** negative.
**Gastrointestinal:** negative.
**Genitourinary:** negative.
**Musculoskeletal:** Chronic R shoulder pain.
**Neurological:** tingling and Occasional R arm tingling.

**Active Problems**
1. Cognitive change (799.59) (R41.89)
2. Hearing impaired (389.9) (H91.90)
3. Neuropathy (355.9) (G62.9)
4. Pain of right side of body (780.96) (R52)
5. Vision changes (368.9) (H53.9)

**Past Medical History**
- History of Assault (E968.9) (Y09)

**Surgical History**
- History of Appendectomy
- History of Nasal Septal Deviation Repair
- History of Treatment Of The Right Ankle

**Family History**
- Family history of Arthritis
- Family history of Arthritis

**Social History**
- Denied: History of Marijuana
- Never a smoker
  - Assessed By: Gates, Doreen; Last Assessed: 10 Jan 2017
- Occasional alcohol use

**Current Meds**
1. Astaxanthin CAPS; patient takes 3x's a week;
   Therapy: (Recorded:10Jan2017) to Recorded
2. Beta Glucan Powder; Patient takes 3x's a week. dg;
   Therapy: (Recorded:10Jan2017) to Recorded
3. Probiotic CAPS; patient takes 3x a week;
   Therapy: (Recorded:10Jan2017) to Recorded

**Allergies**
1. Penicillins

**Vitals**
**Vital Signs**
Heart Rate: 77
Systolic: 138, Right Upper Extremity, Sitting
Diastolic: 90, Right Upper Extremity, Sitting
Height: 5 ft 9.5 in
Weight: 243 lb

**EXHIBIT B**

| Patient: | **CHRISTOPHER KOCHAN** | | |
|---|---|---|---|
| Encounter: | **01/10/2017 12:45PM** | *MRN:* | **M001187123** |

BMI Calculated: 35.37
BSA Calculated: 2.26
Fall Risk Get Up & Go: Rise in single motion

## Physical Exam

**Constitutional**
General appearance: No acute distress, well appearing and well nourished.
**Head and Face**
Head and face: Normal, atraumatic.
**Eyes**
Ophthalmoscopic examination: Normal appearing optic disc and posterior segments.
**Neck**
Neck: Normal, supple, trachea midline, no masses or thyromegaly.
**Pulmonary**
Auscultation of lungs: Clear to auscultation.
**Cardiovascular**
Auscultation of heart: Normal rate and rhythm, normal S1 and S2, no murmurs.
**Neurologic**
Orientation to person, place, and time: Normal.  MMSE: 28/30 - missed one point for WORLD backward and one point for delayed recall. Spells WORLD backward DLORW.
Language: Names objects, able to repeat phrases and speaks spontaneously.
Fund of knowledge: Normal vocabulary with appropriate knowledge of current events and past history.
Light Touch intact: Abnormal.
Pain/Temp intact: Normal.
Vibration intact: Normal.
Examination of Cranial Nerves: Normal.
Muscle strength: Normal strength throughout.  With the exception of R deltoid which is 4/5
Muscle tone: No atrophy, abnormal movements, flaccidity, cogwheeling or spasticity.
Involuntary movements: None observed.  Deep tendon reflexes: 2+ right biceps, 2+ left biceps, 2+ right brachioradialis, 2+ left brachioradialis, 2+ left patella, 2+ left patella, 2+ right ankle jerk and 2+ left ankle jerk.
Decreased sensation to light touch, worse in the radial distribution however also admits to decreased sensation in median and ulnar (to a lesser degree) Coordination: no finger to nose dysmetria.

## Results/Data

CT. No prior Imaging.

## Assessment

1. Never a smoker
   - Assessed By: Gates, Doreen; Last Assessed: 10 Jan 2017
2. Cognitive change (799.59) (R41.89)
   - Assessed By: PHAM, ALISE (Neurology); Last Assessed: 10 Jan 2017
   - Subjective memory complaints since patient was assulted 11 months ago. MMSE 28/30.
     - Will order B12, RPR, TSH, ESR, CRP
     - Patient denies ever having imaging of his head following his injury, therefore will order CT Head
     - F/U 3 months
     - Recommended patient follow up with primary care clinic to establish care
3. Vision changes (368.9) (H53.9)
   - Assessed By: PHAM, ALISE (Neurology); Last Assessed: 10 Jan 2017
   - Subjective difficulty focusing on text
     - No visual deficits on exam
     - Recommended patient follow up with optometrist and have repeat visual testing as his current glasses are >2 years old
4. Pain of right side of body (780.96) (R52)
   - Assessed By: PHAM, ALISE (Neurology); Last Assessed: 10 Jan 2017

**EXHIBIT B**

*Patient:* **CHRISTOPHER KOCHAN**
*Encounter:* **01/10/2017 12:45PM**          *MRN:*   **M001187123**

- Recommend following up with Orthopedics regarding his rotator cuff injury

## Plan

- Follow-up visit in 3 months Outpatient  Follow-up  Status: Hold For - Scheduling Requested for: 10Jan2017
- CRP HS - HIGH SENSITIVE CRP; Status:Active; Requested for:10Jan2017;
- CT Head  Wo IV; Status:Active; Requested for:07Feb2017;
  Transport : Walk
  Clinical Indication Text : Memory Problems
  Clinical Indication : Other
- ESR - SEDIMENTATION RATE; Status:Active; Requested for:10Jan2017;
- SYPHILIS - T PALLIDUM IGG; Status:Active; Requested for:10Jan2017;
- TSH - THYROID STIM HORMONE; Status:Active; Requested for:10Jan2017;
- VIT B12 - VITAMIN B12 LEVEL; Status:Active; Requested for:10Jan2017;
- Primary Care Provider Referral Evaluation and Treatment  Follow-up  Status: Hold For - Scheduling  Requested for: 10Jan2017
  (MU) Care Summary provided. : Yes

## Discussion/Summary

The patient was seen and examined by myself and Dr. Kandel.

## Preceptor Note

**ECMC Attending Specialty:** I saw and evaluated the patient. Discussed with resident and agree with resident's findings and plan as documented in the resident's note.
Mr Kochan Presented to neurology clinic for the first time with multiple complaints including pain, headache, vision change, cognitive impairment. He also admitted that he has a history of multiple trauma. Plan to evaluate for any reversible etiology of cognitive impairment and also obtain imaging of the brain.

## Counseling

**Counseling Documentation:** The patient was counseled regarding instructions for management. total time of encounter was 60 minutes and 30 minutes was spent counseling.

## Patient Care Team

| Care Team Member | Role | Specialty | Office Number |
|---|---|---|---|
| PHAM, ALISE M.D. | | Neurology | (716) 898-3638 |

## Future Appointments

| Date/Time | Provider | Specialty | Site |
|---|---|---|---|
| 02/21/2017 01:00 PM | , , P.A. | | ECMC FAMILY HEALTH CENTER |
| 04/25/2017 01:45 PM | , , P.A. | | NEUROLOGY |

## Signatures

Electronically signed by : ALISE PHAM, M.D.; Jan 10 2017  4:03PM EST          (Author)
Electronically signed by : Amit Kandel, MD; Jan 11 2017  9:36AM EST          (Author)

**EXHIBIT B**

Christopher · Kochan

## CATTARAUGUS COUNTY SHERIFF'S OFFICE

### ADVICE OF RIGHTS

Place: 06H
Date: 02/27/16
Time: 0425

Before we ask you any questions, you must understand your rights.

- You have the right to remain silent.

- Anything you say can be used against you in court.

- You have the right to talk to a lawyer for advice before we ask you any questions and to have them with you during questioning.

- If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

- If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time.

### WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made against me and no pressure or coercion of any kind has been used against me.

Signed: _____

Witness: _W. Nickshmmer_          Refused to sign @ 0426

Witness: _Gaudreau #2120_

Time: _0426_                        -00018

                                    Doc talks about Blood. Agrees in 0505

                                    0451 I will submit to a Breath test

Blood Draw @ 0530

DWI Warning @ 429 No response. 442 No Response

# EXHIBIT C

 **Gmail**

Chris Kochan <chris12108@gmail.com>

## People v. Kochan -- trial transcript request
2 messages

**Kathleen Trost <ktrost@nycourts.gov>**
To: "chris12108@gmail.com" <chris12108@gmail.com>

Mon, Jun 19, 2017 at 4:12 PM

Dear Mr. Kochan,

Let me begin by stating that I have no idea how you got my personal email address.  I will NOT communicate with you using that email address.  Do NOT communicate with me again using that email address. · If you wish to communicate with me by email, you must use my work email of ktrost@nycourts.gov.

That being said, as for your request for your trial transcripts, the following is an estimate (fairly accurate) of the cost of each day's proceedings:

> May 31 -- $600
>
> June 1 -- $570 (to include the very brief appearance on June 2)
>
> June 7 -- $570
>
> June 8 -- $240

As I will require payment up front for these amounts, my suggestion is to pay for each day at a time.  When I receive the money for May 31, I will then prepare the transcript for you, and so on for each date thereafter. When we get to the June 8 proceeding, I will adjust the amount, if necessary, to reflect the actual pages in total and the corresponding actual amount.

Kathy Trost

**Chris Kochan <chris12108@gmail.com>**
To: Kathleen Trost <ktrost@nycourts.gov>
Cc: Melanie Sue <msue@nycourts.gov>
Bcc: IG <ig@nycourts.gov>

Mon, Jun 19, 2017 at 9:50 PM

Dear Ms Trost,

First of all let me begin by stating I am a taxpayer who pays for your position and your response was very rude. Second of all if you do not want people to discover your "personal email address" I SUGGEST THAT YOU DONT POST YOUR PERSONAL EMAIL ADDRESS ON A PUBLIC WEBSITE such as the one I found it on: http://www.nyscra.org/reporterfinder.asp

Further if you would have supplied your e-mail address when I asked for it from the beginning none of this would have occurred and for these prices I expect the true, correct and complete unedited versions (unlike the

**EXHIBIT D**

8/10/2017 12:43 PM

nes that I received from Jillian Koch) and I will pay ASAP and I also expect the pdf version e-mailed to me like I have received from all stenographers.

Chris Kochan



[Quoted text hidden]

 Virus-free. www.avg.com

STATE OF NEW YORK, COUNTY OF CATTARAUGUS SS.
I, Alan Bernstein, Clerk of the County of Cattaraugus of the County Court of said County and of the Supreme Court, both being Courts of Record having a common seal.
DO HEREBY CERTIFY that I have compared this copy with the original filed, recorded, filed and recorded, filed and entered, or entered in the office and that the same is a correct transcript thereof and of the whole of said original.
IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Seal of said County and Courts on
Date 8/10/17                          Clerk

# EXHIBIT D

8/10/2017 12:43 PM

FILED

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF CATTARAUGUS

2014 OCT 31  P 12: 05

CATTARAUGUS COUNTY CLERK

BRITTANY N. JONES, of 115 S. Main Street
Cattaraugus, New York 14719

Plaintiff

against

LORI PETTIT RIEMAN, District Attorney
of Cattaraugus County, New York, of 303 Court Street
Little Valley, New York 14755
and CATTARAUGUS COUNTY, NEW YORK,
a county corporation with its county seat at
303 Court Street, Little Valley, New York 14755,
                                    Defendants

**VERIFIED
COMPLAINT**

Index No.
**83114**

Plaintiff, Brittany N. Jones, respectfully alleges:

1. Plaintiff, Brittany N. Jones, resides at 34 N. 5th Street, Allegany, Cattaraugus County, New York 14706.

2. Defendant Lori Pettit Rieman, Esquire, (hereinafter "Defendant Rieman") is the current District Attorney of Cattaraugus County, New York, and was the said District Attorney at all times subject to this matter.  Her office address is located at 303 Court Street, Little Valley, New York 14755.

3. Defendant Cattaraugus County, New York, (hereinafter "Cattaraugus County") is a county corporation with its county seat at 303 Court Street, Little Valley, New York 14755.  Defendant Cattaraugus County is, and was at all times relevant hereto, Defendant Rieman's employer.  As such, at all times relevant hereto, Defendant Rieman was acting in her capacity as District Attorney, agent and servant for Defendant Cattaraugus County, New York.

CLARKE & SHAFFER, LLP
Attorneys at Law
204 Bolivar Drive
Bradford, PA 16701

**EXHIBIT E**

4. On August 2, 2013, at approximately 4:36 p.m., comments were posted by Defendant Rieman, in the employ of and as agent for Defendant Cattaraugus County, against Plaintiff on the social media website Facebook, which could be construed as defamation.

5. The verbatim defamatory words posted by Defendant Rieman, in the employ of and as agent for Defendant Cattaraugus County, against Plaintiff on the date and time aforesaid were as follows:

Keep Lori Rieman as District Attorney: "Brittany, you lied, under oath, about d.n.a. Evidence and would not stop texting my staff 24 hours a day. We saved them and I will defends [sic] self with the truth, including the DNA report."

Brittany Jones: "Go ahead and keep talking about people's cases. I wouldn't be the first case you and your 'staff' talked about out of a 'privacy' oath."

Keep Lori Rieman as District Attorney: "There is no privacy oath when the 'victim' goes public. I have every right to defends [sic] self with the truth."

6. Further, on August 6, 2013, an article was published in the Olean Times Herald titled "Cattaraugus Co. district attorney debate spills onto social media," located on Pages A-1 and A-2, wherein comments were made by Defendant Rieman, in the employ of and as agent for Defendant Cattaraugus County, against Plaintiff, which could also be construed as defamation.

7. The verbatim defamatory words Defendant Rieman, in the employ of and as agent for Defendant Cattaraugus County, stated in the Olean Times Herald on August 6, 2013, against Plaintiff aforesaid were as follows:

CLARKE & SHAFFER, LLP
Attorneys at Law
204 Bolivar Drive
Bradford, PA 16701

# EXHIBIT E

Regarding allegations that she identified the minor victim in the rape case, and calling her a liar, Ms. Rieman said the victim posted on her Facebook page, identifying herself. She said those were among the postings she deleted from her Facebook page and declined to identify the girl. "She posted her name on Facebook," Ms. Rieman said of the victim who is "saying I broke confidentiality. She lied under oath. She lied about important evidence." The district attorney said the victim gave police underwear she said contained the defendant's semen. It contained the DNA of another man."

8. The statements posted by Defendant Rieman, in the employ of and as agent for Defendant Cattaraugus County, against Plaintiff on Facebook and given to the Olean Times Herald defamed Plaintiff's reputation in the community.

9. Plaintiff was the minor victim in a criminal proceeding which was before the grand jury on December 20, 2012, and involved the counts of Rape in the Third Degree and Disseminating Indecent Material to Minors in the Second Degree.

10. Plaintiff states that she is not guilty of lying under oath in the grand jury proceedings referenced in Number 8 above "about d.n.a. Evidence," in this or any other court of law or in any supporting document.

11. In support of Plaintiff's allegations herein, true and correct copies of the subject postings made to Facebook are attached hereto, collectively referred to as Exhibit "A," and made an integral part hereof; and the article appearing in the Olean Times Herald on August 6, 2013, is attached hereto, marked Exhibit "B," and made an integral part hereof.

12. Defendant Rieman, in the employ of and as agent for Defendant Cattaraugus County, contrived to deprive Plaintiff of her good name, fame and credit

**EXHIBIT E**

aforesaid, and to bring her into scandal and disrepute among her peers and the public in general.

**WHEREFORE,** Plaintiff respectfully requests a monetary judgment against Defendants in the amount of $150,000.00 with interest and the costs of disbursements of this action and such additional, different and further relief as this Court shall determine.

**COUNT I**
**DEFAMATION**

13. Plaintiff herein incorporates Paragraphs 1 – 12 of her Verified Complaint as if set forth in detail herein.

14. Defendant Rieman, in the employ of and agent for Defendant Cattaraugus County, at all times relevant hereto, stated and inferred in a public forum that Plaintiff lied under oath in a criminal proceeding.

15. Plaintiff, as a minor, had limited knowledge as to sexual matters in general and criminal matters in particular.

16. Plaintiff did not make any statements under oath that she knew or should have known at the time she was making them were false or misleading.

17. Defendant Rieman's statements, made while in the employ of and as agent for Defendant Cattaraugus County, as aforesaid in a public forum, in essence, accused Plaintiff of committing a crime in the State of New York.

18. Defendant Rieman's public statements, made while in the employ of and as agent for Defendant Cattaraugus County, constitute defamation per se.

**EXHIBIT E**

19. As a result of Defendant Rieman's public defamatory statements, made while in the employ of and as agent for Defendant Cattaraugus County, Plaintiff has been greatly hurt and injured in her good name, fame and reputation, and has been brought to disgrace and disrepute among her peers and the public in general, who, ever since the writing and posting of the false, scandalous, and defamatory words, suspect her of lying under oath in a court of law.

**WHEREFORE,** Plaintiff respectfully requests a monetary judgment against Defendants in the amount of $150,000.00 with interest and the costs of disbursements of this action and such additional, different and further relief as this Court shall determine.

### COUNT II
### UNCONSENTED TO DISCLOSURE OF CONFIDENTAL/ PRIVILEGE INFORMATION

20. Plaintiff herein incorporates Paragraphs 1 -19 of her Verified Complaint as if set forth fully herein.

21. Defendant Rieman's public statements, made while in the employ of and as agent for Defendant Cattaraugus County, aforesaid disclosed confidential and privileged information to the general public that served no purpose for the prosecution of the underlying crimes.

22. Defendant Rieman's public statements, made while in the employ of and as agent for Defendant Cattaraugus County, were made primarily in a political context in the heat of a contested election.

# EXHIBIT E

CLARKE & SHAFFER, LLP
Attorneys at Law
204 Bolivar Drive
Bradford, PA 16701

23. Defendant Rieman's public statements, made while in the employ of and as agent for Defendant Cattaraugus County, were unconsented to and were made with the mistaken belief that Plaintiff had identified herself in public, and, therefore, any duty of confidentiality or privilege was removed.

24. As a result of Defendant Rieman's public statements, made while in the employ of and as agent for Defendant Cattaraugus County, Plaintiff has been greatly hurt in her good name and reputation, which has resulted in severe psychological harm to Plaintiff, including, but not limited to, depression and anxiety.

**WHEREFORE,** Plaintiff respectfully requests a monetary judgment against Defendants in the amount of $150,000.00 with interest and the costs of disbursements of this action and such additional, different and further relief as this Court shall determine.

Dated: October 29, 2014

Anthony V. Clarke, Esquire
**Clarke & Shaffer, LLP**
204 Bolivar Drive
Bradford, PA  16701
Telephone: 814-363-9990
Facsimile: 814-363-9993
Email: candslaw@verizon.net
Attorneys for Plaintiff

# EXHIBIT E

## VERIFICATION

**BRITTANY N. JONES,** being duly sworn, deposes and says that deponent is the Plaintiff in the within action; that deponent has read the foregoing Verified Complaint, and knows the content thereof; that the same is true to deponent's knowledge, except as to matter therein stated to be alleged on information and belief and as to those matters deponent believes to be true.

_____
Brittany N. Jones

Sworn to and subscribed before me this
The 29th day of October, 2014.

_____
Notary Public
My commission expires: 10-13-17

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Pamela K. Blauser, Notary Public
Foster Twp., McKean County
My Commission Expires Oct. 13, 2017
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

# EXHIBIT E

CLARKE & SHAFFER, LLP
Attorneys at Law
204 Bolivar Drive
Bradford, PA 16701





**Brittany Jones**

Really? bullying and pointing out the opponents flaws is going to gain you votes? From a VICTIMS stand point I can tell you it's not. I think the election should be focused on VICTIMS. Clearly, its not on your part. So many victims have suffered and been hurt from that office due to such HUGE injustices. Now they are left alone to suffer and settle because they never got the justice or peace of mind they deserved. My votes for Mark. Along with my friends and family. It's time for a change, it's time for trust, it's time for justice to finally be done.

1 hour ago · Like

**Keep Lori Rieman as District...**
One debate. With rules.
1 hour ago · Like

1 hour ago · Like

Write a comment...

Post

**EXHIBIT E**

PLAINTIFF'S EXHIBIT





**Keep Lori Rieman as District Attorney**
Brittany, you lied, under oath, about d.n.a. Evidence and would not stop texting my staff 24 hours a day. We saved them and I will defends self with the truth, including the DNA report.

Like · 25 minutes ago



**Kelly Drago**
Yes he does. His philosophy is if I have it, spend it, or they will take it away. Waste of the county's money!!

Like · 16 minutes ago



**Keep Lori Rieman as District Attorney**
There is no privacy oath when the "victim" goes public. I have every right to defends self with the truth.

Like · 13 minutes ago



8/5/2013 12:00 PM

initiative.

The senator is slated to speak about a new piece of legislation called the America Works Act, which hopes to restructure financing for work-force training programs. According to a press release from Sen. Schumer's office, programs that work to provide industry-recognized credentials to graduates will earn federal funding priority under the act. Citing the reported lack of skilled labor at area industries, the senator hopes to reach students



Sen. Charles Schumer

calling on the federal government to "build on Dream It. Do It."

Dream It. Do It. project coordinator Kathleen Martel said Sen. Schumer was scheduled to visit JCC last month. Flooding in central New York curtailed those plans, so Mrs. Martel said she's anxious to hear the legislator's ideas now.

"He is trying to bring more funding to our area to support the workforce," she said. "So anywhere we're teaming education with industry, he wants to

facturing representatives, in addition to JCC-Olean officials and Manufacturers Association of the Southern Tier Executive Director Todd Tranum.

"We appreciate Mr. Schumer's efforts to help provide more funding opportunities to our programs and his willingness to hold up Cattaraugus County as a model for the rest of the country by highlighting the programs we are doing," Mrs. Martel said. "He wants to promote Dream It. Do It. and JCC, as we're both working with area industries to

Please see **Schumer**, page A-2

## wea

### Early-M approac

By Kelsey M.
Olean Times H

OLEAN
July, the low
burned area
their wallets
power usage
The inten
humidity br
daytime ten
roughly the
for much of
Nights have
sonably cool
days" of sur
by a low of
morning —
Aug. 5 all-ti
43 set in Ole

And thos
daytime hig
chilly eveni
remain awhi
Hitchcock, a
National We
meteorologi

"It's been
from the str
weather tha
Mr. Hitchco
then, we ha
ridge of hig
the Ohio Va
Northeast. 1
hot mid-Jul
northeast q
try. That pa
with about
July, and si
been really

Now, if
pressure e
Great Lake
much of th

---

# Cattaraugus Co. district attorney debate spills onto social media

## Rieman-Williams struggle continues

By Rick Miller
Olean Times Herald

The Republican primary for Cattaraugus County district attorney has become one of the first local campaigns to see the debate churn in social media.

Soon after Cattaraugus County District Attorney Lori P. Rieman created a Facebook page titled "Keep Lori Rieman as District Attorney" on Saturday, inviting supporters to compare her budget with that of her opponent, Public Defender Mark S. Williams, he then commented on her post.

Ms. Rieman said the county

budget would show the public defender's budget "costs the county twice as much money. Enlightening."

Mr. Williams commented on that post, saying the district attorney was "incorrect. My budget as public defender is over $100,000 less than the district attorney's budget. My budget includes our attorneys' costs for Criminal and Family Court. How about getting the facts straight?"

Ms. Rieman said Mr. Williams, who backed the creation of the public defender's post as a county legislator and was later appoint-



Mark Williams

ed to the job after stepping down from the Legislature, had vowed to cut costs, but they had more than tripled since 2001 when the assigned counsel program costs were $643,566.



Lori Rieman

In another development, an email from truthforcattaraugus@yahoo.com was received Monday by the Times Herald saying postings by Mr. Williams on Ms. Rieman's Facebook page had been deleted.

The email supportive of Mr. Williams from truthforcattarau-

Please see **DA**, page A-2



PLAINTIFF'S EXHIBIT "B"

### Index

Comment . . . . . . . . . . . . A-6
Deaths . . . . . . . . . . . . . . A-4
Lifetime . . . . . . . . . . . . . A-8
Sports . . . . . . . . . . . . . . B-1
Weather . . . . . . . . . . . . A-12



# THANK YOU
Thank you to the 30,000 daily reade
of the Olean Times Herald.

# EXHIBIT E

of people think this weath-

and a high in the mid-70s

Wednesday will be

For a deeper look at

on Twitter, @KelseyMBoudin)

whether somebody close to my campaign sent it. I didn't write it, and I don't know anything about it."

Mr. Williams, who just created his Facebook page on Thursday said he saw

"He just wants free advertising," Ms. Rieman said of Mr. Williams' Facebook postings and the anonymous email pointing out the controversy.

Ms. Rieman said she "struck a nerve" with him to that stuff anymore. I took it off my site." She said her 14-year-old son told her: "Don't do a Facebook fight. Too late."

Contacted for comment by the Times Herald, Mr. Williams said he posted on Mr. Rieman's Facebook page on Saturday and saw later that his postings had been deleted.

"I posted on her Facebook while I was at the Buffalo Airport, and when I got to Atlanta, they had been deleted," he said.

Mr. Williams said he had not heard about the email from truthforcat-taraugus@yahoo.com that was received Monday by the Times Herald. "I have never heard about it," he said in a telephone interview. "(I'll look into)

## Officials: NY man tried to sell baby on Craigslist

NEW YORK (AP) — A New York man has been

Authorities say Marquez had been out with the baby's

gave the mother's phone number to a person who

and is "not going to respond to that stuff anymore. I took it off my site." She said her

He said he continues to highlight victims' rights and what he calls "a lack of organization and prepara-tion" by the district attor-ney's office that has led to a high number of cases being dismissed.

Mr. Williams said his campaign will launch its website soon and that he has a Twitter account.

"I'm not going to discuss my clients, but campaign things," the candidate explained.

(Contact reporter Rick Miller at rmiller@olean-timesherald.com)



7/27/2019                           Gmail - About your catcountycorruption.com bluehost.com account

 **Gmail**                                  **Cat County Corruption <catcountycorruption@gmail.com>**

## About your catcountycorruption.com bluehost.com account
6 messages

**tos@bluehost.com** <tos@bluehost.com>                                          Sun, Jun 12, 2016 at 2:51 PM
To: catcountycorruption@gmail.com

    Hello,

    Thank you for resolving the issue of personally identifying information on the account. After reviewing your posts it seems
    you should be good to go. There is one further issue in the comments which we understand is not written by you. At this
    time the account will remain active, but we do ask that you resolve or remove this comment in order to comply with our
    Terms of Service so that it can stay this way. The comment ID is 105 and sates Jillian Koch's name specifically in it. That
    should be the only remaining issue at this point in time. You can go through phpmyadmin to remove or edit this comment,
    if you have any questions or need help with that you can contact support so they can assist you with how to get into
    phpmyadmin.

    Thank you,

    Bluehost Terms of Service Compliance

    http://www.bluehost.com
    For support, go to http://my.bluehost.com/cgi/help

**Cat County Corruption** <catcountycorruption@gmail.com>                         Sun, Jun 12, 2016 at 4:16 PM
To: tos@bluehost.com

    Comments are turned off, what are you talking about? URL please. This is getting some good facebook interests
    [Quoted text hidden]

**Cat County Corruption** <catcountycorruption@gmail.com>                         Sun, Jun 12, 2016 at 4:28 PM
To: tos@bluehost.com

    When are you going to properly answer my original response with any sort of clarity? Do you abide by the freedom of
    speech 1st amendment right?
    [Quoted text hidden]

**Bluehost ToS Team** <tos@bluehost.com>                                          Mon, Jun 13, 2016 at 10:08 AM
To: catcountycorruption@gmail.com

    Hello,

    For security purposes, we'll need you to validate ownership of your account;
    please validate ownership of the account by providing the following:

    - The last four characters of the Main Account password on your account.

    Help us improve our support by answering a quick survey: http://survey.bluehost.com/s3/6tPZgMwOx2

    Thank you,
    Matthew
    Terms of Service Compliance Department
    560 East Timpanogos Pkwy.
    Building G
    Orem, UT, 84097                                                  **EXHIBIT F**
    F: 801.765.1992



Most questions can be answered by articles in our knowledgebase or our NEW forum!
Forum:          http://www.bluehostforum.com
Knowledgebase: https://www.bluehost.com/cgi/help

New to Bluehost? Make your website a success. Get help from our Professional Services:  https://my.bluehost.com/cgi/
services

---

**tos@bluehost.com** <tos@bluehost.com>                                      Mon, Jun 13, 2016 at 3:14 PM
To: catcountycorruption@gmail.com

Please be advised that we have received report (summary below) of a violation of our Terms of Service
(http://www.bluehost.com/acceptable-use-policy#private) on your account.

6.04 Private Information and Images. Subscribers may not post or disclose any personal or private information about or
images of children or any third party without the consent of said party (or a parent's consent in the case of a minor).

Please review your account and remove any information relating to the claimed violation within two business days.

Should you have any questions, please contact us.

Thank you,
Legal Department

REPORT
-------------
Please remove any reference to Lori Rieman from catcountycorruption.com.
[Quoted text hidden]

---

**Cat County Corruption** <catcountycorruption@gmail.com>                    Mon, Jun 13, 2016 at 3:26 PM
To: tos@bluehost.com

Copy of complaint please, further I have gone though everything again and appears I have removed all Jillian Kochn meta
tag data
[Quoted text hidden]

# EXHIBIT F

8/15/2019                         Holding Center victim's uncle appeals for action; DA calls it 'threat' – The Buffalo News

Search                                                              (https://buffalonews.com/)

# THE BUFFALO NEWS

# Holding Center victim's uncle appeals for action; DA calls it 'threat'



*A state agency says Richard Metcalf Jr. was strangled by the jail deputies who restrained him in the Erie County Holding Center in November 2012.*

---

**By Matthew Spina (https://buffalonews.com/author/matthew_spina/)**
Published December 1, 2017 | Updated December 1, 2017

---

(https://facebook.com/sharer/sharer/tweet)

Paul Metcalf told the district attorney he was writing to her as the uncle of the deceased and an "optimistic patriot who believes in our system of law and justice."

He went on to suggest in his email to District Attorney Lori Pettit Rieman of Cattaraugus County that she was doing too little to prosecute those responsible for the death of his nephew, Richard A. Metcalf Jr.

She eventually told him to stop threatening her.

**EXHIBIT G**

https://buffalonews.com/2017/12/01/hunting-accident-victims-uncle-appeals-for-action-da-calls-it-threat/                                1/7

"Please stop sending me your threatening emails," Rieman told Paul Metcalf, according to the email chain obtained by The News. "You have absolutely no clue as to what I am doing or have done with respect to your nephew's case."

A state agency says Richard Metcalf Jr. was strangled by the jail deputies who restrained him in the Erie County Holding Center in November 2012. The state Commission of Correction then urged the Erie County District Attorney's Office to consider a criminal prosecution. The job went to Rieman because the Erie County DA's Office had a conflict of interest.

Rieman took the case in February but has yet to say what she'll do with it.

Clock runs out on two possible charges in death of Holding Center inmate (//buffalonews.com/2017/12/01/clock-runs-out-on-two-possible-charges-in-death-of-holding-center-inmate/)

Paul Metcalf emailed her nine months later, on Nov. 12, almost five years after his nephew died at age 35. His words emphasized the family's belief that the criminal justice system has so far let them down.

While the family harbors little hope that criminal charges will be filed, the victim's father is gratified that Rieman agreed to meet with him within the next few weeks, he said through a family attorney. The lawyer, Thomas J. Casey, requested the meeting just days ago, and she agreed.

In his email Nov. 12, Paul Metcalf asked Rieman if she had seen the autopsy photos of Richard Metcalf's badly bruised body? He reminded her that jail deputies knotted a spit mask around his neck and pulled a pillow case over his head, leaving him unable to breathe. He noted that the deputies had violated the jail's policies and procedures.

He went on to say he found it "suspicious" that after nine months she had not called people who have important information about the case, including the state forensic pathologist who concluded Metcalf was asphyxiated, Dr. Michael Baden.

Metcalf, a retail industry consultant living in Massachusetts, ended his email by saying the family was still hoping for justice. He urged the prosecutor to do more.

"We are counting on you to be that person you were sworn in to be, that optimistic, bright woman who will do what's right regardless of the implications. I hope our faith in the system is well-founded," he said. "I trust it is and pray to God you don't join those animals by condoning their actions."

When he received no response, Paul Metcalf wrote again 10 days later. It was the day before Thanksgiving.

"It's very unfortunate that you are so neglectful of not only your duty but to any due diligence of obvious violations of the law," he said in his second email. He suggested that given her inaction, she should not be able to sleep at night.

"Have a happy holiday with your family. We won't be able to," he said.

Rieman responded minutes later by telling him to stop the threats.



**EXHIBIT G**

"You have absolutely no clue as to what I am doing or have done with respect to your nephew's case as I have not released my results or conclusions yet," she said.

"You have no idea how seriously I pursue my obligations and obviously are ignorant as to the numerous accomplishments I have made in pursuing the hundreds of cases in which I have sought justice. Your emails hereafter will go to junk mail as your complete lack of knowledge of the facts and law disturb me. Moreover, they are clearly veiled attempts to force me to act in a certain manner."

Paul Metcalf sent off one last message.

"I'm not sure what threats you are reading in my email," he said. "Actually, I have gone out of my way to be objective and give you the benefit of the doubt...

He mentioned that the autopsy found Richard Metcalf suffered 161 bruises plus broken ribs. Then, as the Commission of Correction said, he had been strangled.

"Maybe if I understood the law better I wouldn't still be expecting justice," Paul Metcalf wrote.

"I will not send you any further emails as it would appear it's not worth my time and [it's] obviously beyond your capacity as a public official to respond to them like an adult."


*(https://buffalonews.com/author/matthew_spina/)* **Matthew Spina** – *Matthew Spina, a staff reporter at The Buffalo News since 2004, has worked in daily newspaper journalism for more than 30 years. He's a graduate of SUNY Buffalo State and grew up in Schenectady, N.Y.*

## SUPPORT LOCAL JOURNALISM

*If you value these stories, please consider subscribing.*

Subscribe (https://subscribe.buffalonews.com/?utm_source=article&utm_campaign=support_sul

There are no comments – be the first to comment                          0

## Recommended for you

# EXHIBIT G

**Colvin Estates homeowners growing impatient over work delays (https://buffalonews.com/2019/08/15/colvin-**